UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 07-3906 (FLW)


_____

IN RE:                        :   TRANSCRIPT OF PROCEEDINGS
VONAGE MARKETING AND          :
SALES PRACTICES LITIGATION:       MAY 12, 2011
_____:


CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NEW JERSEY  08608


B E F O R E:  THE HONORABLE FREDA L. WOLFSON, USDJ


A P P E A R A N C E S:


  COHEN, MILSTEIN, SELLERS & TOLL, ESQUIRES
  BY:  ANDREW N. FRIEDMAN, ESQUIRE
       VICTORIA S. NUGENT, ESQUIRE
            -and-
  SEEGER, WEISS, ESQUIRES
  BY:  SCOTT A GEORGE, ESQUIRE
       JONATHAN SHUB, ESQUIRE
  On behalf of the Plaintiffs

  BINGHAM McCUTCHEN, ESQUIRES
  BY:  FRANK G. LAMANCUSA, ESQUIRE
  On behalf of Defendant Vonage


A L S O   P R E S E N T:


RANDI FRIEDMAN, ESQUIRE
Vonage In-House Counsel



* * * * *
VINCENT RUSSONIELLO, C.C.R.
OFFICIAL U.S. COURT REPORTER
138 PAXSON AVENUE TRENTON, NEW JERSEY  08690
(609) 588-9516

**C E R T I F I C A T E**

      PURSUANT TO SECTION 753, TITLE 28, USC, THE
FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE
TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE
ABOVE-ENTITLED MATTER.

<u>S/Vincent Russoniello</u>
VINCENT RUSSONIELLO, C.C.R.
OFFICIAL U.S. COURT REPORTER

**INDEX**

| **Proceedings** | **Page** |
|---|---|
| Discussion | |
| By the Court | 5 |
| By Mr. George | 6 |
| By Mr. Lamancusa | 6 |
| Findings by the Court | 7-57 |

```
 1              (In open court.)

 2              THE CLERK:  All rise.

 3              THE COURT:  Thank you.

 4         Good morning.  Let me have the appearances,

 5   please.

 6              MR. GEORGE:  Good morning, your Honor.

 7              Scott Alan George with Seeger Weiss for the

 8   plaintiffs in the class.

 9              MR. FRIEDMAN:  Good morning, your Honor.

10   Andrew Friedman with Cohen, Milstein, Sellers & Toll,

11   also for the class.

12              MS. NUGENT:  Victoria Nugent with Cohen,

13   Milstein, Sellers & Toll, also for the class.

14              MR. SHUB:  Good morning, your Honor.

15              Jonathan Shub, Seeger, Weiss for the class.

16              MR. LAMANCUSA:  Good morning, your Honor.

17              Frank Lamancusa, Bingham, McCutchen, for

18   Vonage.

19              MS. FRIEDMAN:  Randy Friedman, in-house

20   counsel, for Vonage, along with my business colleague,

21   Rennard Snowden.

22              THE COURT:  Thank you.

23              Who is going to be speaking on behalf of the

24   plaintiff?

25              MR. GEORGE:  Myself, your Honor, Scott George.
```

1           THE COURT:  Have a seat everyone.  Thank you.

2           I have received all of the papers that have

3     been submitted by class counsel in this matter in

4     support of the final order to approve the settlement

5     in this matter and to certify the class for settlement

6     purposes.  In that regard I have received the documen-

7     tation regarding how notification was provided.

8           I have also received the limited objections

9     that have been filed in this matter, the written

10    objections, and you have provided me with copies of

11    those.  I have those as exhibits at this point, your

12    response to those objections, and I'm looking about

13    the courtroom now and I see that there are no

14    objectors who are present here in court today.

15    Everyone seems to agree with that.  And, certainly,

16    having looked at the objections and where these

17    various individuals were located, none of them were

18    submitted, obviously, by individuals represented by

19    counsel.  I think one of the objectors is an attorney

20    himself who is a party, but, other than that, they are

21    all out of state; and I note that none of them are

22    present here today to present any further argument or

23    position in that regard.

24          With that, I'll hear a short presentation from

25    the plaintiffs, if there is anything else that you

1  wish to add to the papers that you have already

2  submitted.

3       MR. GEORGE:  No, your Honor, just that this is

4  providing dollar-for-dollar relief to the settlement

5  class which is particularly valuable given the recent

6  decision by the Supreme Court in Concepcion which

7  would have given defendant Vonage a far firmer foot to

8  challenge class certification in this case and demand

9  individual arbitration of the claims asserted by the

10 plaintiff.

11      The notice program was robust with direct

12 notice to the class.  Over 6 million emails went out

13 to the 3 million or so class members.  We have only a

14 few objections and a handful of opt-outs.  It speaks

15 volumes to the benefits that this settlement is giving

16 to the class, and we believe, as we said in our

17 papers, it should be approved as fair and adequate.

18      THE COURT:  I know that the defendant has

19 submitted no papers and is taking basically no

20 position with regard to the fee request or anything

21 else in that regard.

22      Is that correct?

23      MR. LAMANCUSA:  That is correct.  We do not

24 oppose the fee request.

25 ///

1            THE COURT:   Then, at this point, I don't think

2    we need to belabor any further positions.  I have

3    those.  I'm ready to issue my findings with regard to

4    this matter.

5            This will be the Court's determination of the

6    motions for final approval of the proposed settlement

7    and an award of attorneys' fees and reimbursement of

8    expenses that have been filed by the named

9    plaintiffs -- Budd Nahay, Robert Starrett, Alex

10   Nevelson, Eric Terrell, Darlene Pennock, Francesco

11   Trama, and John Stewart, that I'll collectively refer

12   to as the "plaintiffs" in this oral opinion; and this

13   settlement is to resolve all claims asserted against

14   defendant Vonage America, Inc., Vonage Holdings Corp.,

15   and Vonage Marketing, Inc., that I'll collectively

16   refer to as "Vonage" throughout the proceedings.

17           Let me begin by some of the procedural

18   history.

19           Vonage sells products and services which are

20   designed to enable its customers to make and receive

21   telephone calls over the internet.  On December 4,

22   2006, plaintiffs Nahay and Starrett initiated a

23   putative class action lawsuit against Vonage alleging

24   that Vonage misrepresented several features of its

25   service, including the service of its promotional one

1    month free and money-back guarantee offers, and the

2    charges associated with the account cancellation, and

3    that Vonage failed to timely honor requests for

4    cancelation.  Subsequently, several actions were filed

5    based on similar allegations around the nation.

6         On August 6, 2007, the Judicial Panel on

7    Multi-District Litigation transferred all related

8    actions to this Court.  On November 19, 2008, the

9    Court consolidated the transferred cases and appointed

10   Cohen, Milstein, Sellers & Toll, PLLC, and Seeger,

11   Weiss, LLP, as co-lead class counsel.  The following

12   month plaintiffs filed a consolidated class action

13   complaint.  In that complaint, plaintiffs sought

14   relief on behalf of a nationwide class for breach of

15   contract, breach of implied covenant of good faith and

16   fair dealing, and violations of New Jersey and

17   California consumer protection laws, and for unjust

18   enrichment.

19        After the filing of the complaint, Vonage

20   moved to compel arbitration and to dismiss and/or stay

21   claims based on arbitration clauses, including bans on

22   class actions that were included in Vonage's various

23   terms of service.

24        On September 1, 2009, the Court heard and

25   denied Vonage's motion without prejudice to Vonage

1    resubmitting the motion after a period of discovery

2    relating to the dispute resolution arbitration

3    provisions.

4         On November 16, 2009, Vonage and the attorneys

5    general of 32 states entered into a settlement.

6    Central to this settlement were prospective changes in

7    the disclosures made by Vonage to customers, as well

8    as changes to its cancelation procedure to better

9    ensure that cancelations were timely made.  In this

10   settlement, compensation was made available to persons

11   who had complained before March 16, 2010, to the

12   attorneys general.  However, no wider notice or claims

13   process was available to customers who had not filed

14   such a complaint.

15        On December 2, 2009, Vonage renewed its motion

16   to compel arbitration, and the motion was pending

17   during the parties' settlement discussions in this

18   case.  The parties agreed to administratively

19   terminate that motion in light of the settlement

20   talks.

21        Eventually, the parties entered into a

22   settlement in principle on September 24, 2010.

23        On January 13, 2011, the Court granted

24   preliminary approval of the settlement.

25        Is there an issue, counsel?

1          MR. LAMANCUSA:   I thought that was January

2     3rd?

3          MR. GEORGE:   Yes, January 3rd.

4          THE COURT:   Okay.  Let me correct that, the

5     3rd.

6          If you have any issues as I'm reading this,

7     interrupt me.

8          MR. LAMANCUSA:  Understood.  Thank you.

9          THE COURT:  It's a long oral opinion, so feel

10    free.

11         Notice to the class included direct notice by

12    electronic mail to all account holders who are or may

13    be affected by the settlement, publication for three

14    weekdays in USA Today, a static notice on account

15    holder's account sites, a toll-free number, and a

16    dedicated web page that provided access to the long

17    form notice, frequently asked questions, and important

18    litigation documents, including the settlement agree-

19    ment.

20         In this proposed settlement Vonage agrees to

21    make a payment of $4.75 million in cash into a common

22    fund for the benefit of the proposed settlement class,

23    including the costs of settlement administration and

24    attorneys' fees and costs associated with the

25    prosecution of these claims and the administration of

1    the settlement.  The proposed settlement class

2    consists of: all persons in the United States, its

3    territories or possessions who are or were subscribers

4    or customers of Vonage on or before the entry of the

5    preliminary approval order of January 3rd, 2011, who:

6           1.  Signed up under a one- or two-month free

7    service promotion;

8           2.  Cancelled service within 10 days of the

9    expiration of their money-back guarantee promotion;

10          3.  Were charged a disconnection fee; and/or

11          4.  Requested cancelation but were thereafter

12    charged regular monthly service fees for service they

13    did not use after the cancellation request.  Cash

14    benefits available to the members of the settlement

15    class for these four categories of damages are as

16    follows:

17          1.  One month free claims:  Class members who

18    subscribed to Vonage service under a one- or two-month

19    free promotion and the promotional period of service

20    began on the date their accounts were administratively

21    opened, not the date full service was available for

22    use, are eligible to receive $10.

23          2.  Money-back guarantee claims:  Class

24    members who subscribed to Vonage service under a

25    money-back guarantee promotion and cancelled their

1    subscription between 31 and 40 days after signing up

2    with Vonage but were charged and paid a monthly

3    service fee or equipment charges from Vonage and did

4    not receive a refund or credit from Vonage for such

5    fees or charges are eligible to receive a refund for

6    such fees and charges.  The refund would not exceed

7    $25 for the monthly service fee and $80 for equipment

8    charges, and it may be subject to pro rata reduction.

9         MR. GEORGE:  Your Honor?

10        THE COURT:  Yes.

11        MR. GEORGE:  There was a small period of time

12   in the categories definition as well where there was a

13   two-month money-back guarantee window, which your

14   Honor has not provided for in the oral opinion so far,

15   where it was between 61 and 70 days, between August

16   15th, 2007, and February 3rd, 2008.

17        THE COURT:  Let me hear exactly what the

18   language is that's included there.

19        MR. GEORGE:  Okay.  After the 31- and 40-day

20   window, there is -- or between 61 and 70 days for

21   settlement class members who signed up between August

22   15, 2007, and February 3, 2008.

23        THE COURT:  Same amounts?

24        MR. GEORGE:  Yes.

25        THE COURT:  Okay.

1          3, the disconnection fee claims:  Class

2     members who subscribed to Vonage service who were

3     charged and paid any termination, cancellation, or

4     disconnection fee for cancelling Vonage service, and

5     did not receive a refund or credit for such fees from

6     Vonage, are eligible to receive payment for those

7     fees.  The refund would not exceed $40, and it may be

8     subject to pro rata deduction.

9          4.  The post-cancelation service fee claims:

10    Class members who requested cancelation of their

11    subscription with Vonage but were thereafter charged

12    and paid regular monthly service fees for service they

13    did not otherwise use after the cancelation and they

14    were not reimbursed for those charges from Vonage are

15    eligible to receive payment for such service fees.

16    The refund would not exceed $50, and it may be subject

17    to pro rata reduction.

18         No cash payment will be made on any claim for

19    any of these categories where the total distribution

20    amount is less than $10.  Class members may be

21    eligible for up to $195 in cash benefits subject to

22    pro rata reduction.

23         I'll next discuss the steps which the parties

24    took in sending out the settlement notices to

25    potential class members.

1          After I preliminary approved the class action

2     settlement, Vonage personnel began the process of

3     identifying the current and former Vonage accounts

4     that would receive notice of the settlement via email.

5          As of January 4, 2011, the complete universe

6     of Vonage U.S. accounts was 6,316,002.  From that list

7     Vonage excluded accounts that did not meet the

8     requirements of the class members as set forth in the

9     Court's preliminary approval.  Ultimately, nearly 82

10    percent of all U.S. Vonage accounts were sent email

11    notifications of the proposed settlement.  Using the

12    services of PM Digital, Inc., within 20 days of the

13    entry of the preliminary approval, Vonage sent a total

14    of 5,179,301 notifications to email addresses of which

15    over 80 percent were successfully delivered.

16              MR. LAMANCUSA:  Excuse me, your Honor?

17              THE COURT:  Yes.

18              MR. LAMANCUSA:  One point of correction.  The

19    email addresses were 5,179,031.

20              THE COURT:  All right.

21              MS. FRIEDMAN:  Your Honor, also, we started

22    the emails within 20 days.  They weren't complete

23    within 20 days.

24              THE COURT:  Okay.

25              MS. FRIEDMAN:  Per the Court's order.

1          THE COURT:  Let me clarify that those email

2    certifications began within 20 days.

3          When was the process completed?

4          MR. LAMANCUSA:  February 11th.

5          THE COURT:  And the process of email notifi-

6    cation was completed then by February 11.

7          MR. LAMANCUSA:  That's correct.

8          THE COURT:  And of those, over 80 percent were

9    successfully delivered.

10         MR. LAMANCUSA:  That is correct.

11         THE COURT:  In addition, Vonage posted an

12   announcement on its website regarding the settlement

13   to all of its then customers which ran for 60 consecu-

14   tive days.  The customers were directed to call a toll

15   free number or go to a website to obtain information

16   regarding the settlement.

17         Finally, a publication with information

18   regarding the settlement was posted on USA Today for

19   three weeks.

20         Is that correct?

21         MR. GEORGE:  Three days.

22         THE COURT:  That's what I had previously.

23   Three days.

24         In response to the notices, as of April 28,

25   2011, the parties have received a total of 103 timely

1    opt-outs; and as of April 8, 2011, plaintiff received

2    38,653 claims.

3            Is that correct?

4            MR. GEORGE:  Yes, your Honor.

5            THE COURT:  The deadline for submitting a

6    claim is 60 days after the entry of the final approval

7    order and judgment.  Plaintiffs, with the assistance

8    of Epiq Class Action and Claims Solutions, the settle-

9    ment administrator, will administer the common fund,

10   including dispersing the award to class members.

11           Furthermore, a total of 12 objections have

12   been received by the Court from class members raising

13   various issues ranging from the fairness of the

14   settlement to the alleged excessiveness of the

15   requested attorneys' fees by plaintiffs, and those

16   objections will be discussed more fully in this

17   opinion.

18           Class certification.

19           As the case has not proceeded to the class

20   certification stage, the Court has to first determine

21   whether to certify the settlement case.  The Third

22   Circuit in In re Insurance brokerage Antitrust

23   Litigation, 579 F.3d 241, 257-58, 3d Cir. 2009,

24   explained the standard for class certification in a

25   settlement context.  In order to approve a class

1   settlement agreement, "a District Court must determine

2   that the requirements for class certification under

3   Federal Rule of Civil Procedure 23(a) and (b) are met

4   and must determine that the settlement is fair to the

5   class under Federal Rule of Civil Procedure 23(e)."

6       As the Supreme Court has made clear, "Con-

7   fronted with a request for settlement-only class

8   certification, a District Court need not inquire

9   whether the case, if tried, would present intractable

10  management problems, for the proposal is that there

11  would be no trial.  But other specifications of Rule

12  23, those designed to protect absentees by blocking

13  unwarranted or overbroad class definitions, demand

14  undiluted, even heightened, attention in the

15  settlement context."  Amchem Products, Inc., v.

16  Windsor, 521 U.S. 591, 1997.

17      Further, the Court indicated:  "If a fairness

18  inquiry under Rule 23(e) controlled certification,

19  eclipsing Rule 23(a) and (b) and permitting class

20  designation despite the impossibility of litigation,

21  both class counsel and the Court would be disarmed."

22  Thus, it is important to "apply the class certifica-

23  tion requirements of Rules 23(a) and (b) separately

24  from the fairness determination under Rule 23(e)."

25  In re Prudential Insurance Company America Sales

1   <u>Practice Litigation Agent Actions</u>, 148 F.3d 2383, 3d
2   Cir. 1998.
3       "The requirements of Rule 23(a) and (b) are
4   designed to insure that a proposed class has
5   'sufficient unity so that absent class members can
6   fairly be bound by decisions of class representa-
7   tives.'"  Under Rule 23(a) the prerequisites to class
8   are:
9       "One, the class is so numerous that joinder of
10  all members is impracticable.  Two, there are
11  questions of law or fact common to the class.  Three,
12  the claims or defenses of the representative parties
13  are typical of the claims or defenses of the class.
14  And, four, the representative parties will fairly and
15  adequately protect the interests of the class."
16  That's Federal Rule of Civil Procedure 23(a).  <u>Also,</u>
17  <u>see</u> <u>Amchem</u>, 521 U.S. at 613.
18      "If all of the prerequisites of Rule 23(a) are
19  satisfied, a class action may be maintained if the
20  standards set forth in Rule 23(b) are satisfied as
21  well."  <u>In re Insurance Brokerage</u>, 579 F.3d at 257.
22      Rule 23(b)(3) requires "the Court to find that
23  the questions of law or fact common to class members
24  predominate over any questions affecting only
25  individual members and that a class action is superior

1  to other available methods for fairly and efficiently

2  adjudicating the controversy."  Amchem, 521 U.S., at

3  618.  Also from the case:  "Among current applications

4  of Rule 23(b)(3) the 'settlement only' class has

5  become a stock device."  The "factual determinations

6  necessary to make Rule 23 findings must be made by a

7  preponderance of the evidence.  In other words, to

8  certify a class, the District Court must find that the

9  evidence more likely than not establishes each fact

10 necessary to meet the requirements of Rule 23."  In re

11 Insurance Brokerage, 552 F.3d at 258.  Accordingly,

12 "class certification is proper only if the Court is

13 satisfied after a rigorous analysis that the pre-

14 requisites of Rule 23 are met."

15      "Even if it has satisfied the requirements for

16 certification under Rule 23, a class action cannot be

17 settled without the approval of the Court and a deter-

18 mination that the proposed settlement is fair, reason-

19 able, and adequate."  In re Prudential Insurance

20 Company, 148 F.3d at 316.  See 23(e)(2) stating that a

21 District Court may approve a proposed settlement "only

22 after a hearing and on finding that it is fair,

23 reasonable, and adequate."

24      In In re Insurance Brokerage the Third Circuit

25 affirmed the applicability of nine factors established

1    in <u>Girsh v. Jepson</u>, 521 F.2d 153, 3d Cir. 1975, which

2    are to be considered when determining the fairness of

3    a proposed settlement.  "Where settlement negotiations

4    precede class certification and approval for settle-

5    ment and certification are sought simultaneously, we

6    require District Courts to be even more scrupulous

7    than usual when examining the fairness of the proposed

8    settlement."  <u>In re Sodium Antitrust Litigation</u>, 391

9    F.3d 516, 534, 3d Cir. 2004.

10          As stated earlier, the parties request that

11   the following should be certified as a class:  All

12   persons in the United States, its territories or

13   possessions who are or were subscribers or customers

14   of Vonage on or before the entry of the preliminary

15   approval order on January 3, 2011, who:  1, signed up

16   under a one- or two-month free service promotion; 2,

17   cancelled service within ten days of the expiration of

18   their money-back guarantee promotion; 3, were charged

19   a disconnection fee; and/or, 4, requested cancelation

20   but were thereafter charged regular monthly service

21   fees for service they did not use after the cancela-

22   tion request.

23          I'll now address numerosity.

24          First, the Court determines whether plaintiffs

25   have satisfied the prerequisites for maintaining a

1   class action as set forth in Rule 23(a).

2          With respect to numerosity, a party need not

3   precisely enumerate the class members to proceed as a

4   class action.   In re Lucent Technology, Inc., Securi-

5   ties Litigation, 307 F.Supp.2d 633, District of New

6   Jersey, 2004.   A class may not be certified unless the

7   representative class members "will fairly and

8   adequately protect the interests of the class."

9   Federal Rule of Civil Procedure 23(a)(4).   "Rule

10  23(a)'s adequacy of representation requirement 'serves

11  to uncover conflicts of interest between named parties

12  and the class they seek to represent.'"   In re Pet

13  Food Products Liability Litigation, 2010 U.S. App.

14  Lexis 25628, at 26-27, 3d Cir. December 16, 2010,

15  quoting Amchem.   Class representatives "must be part

16  of the class and possess the same interest and suffer

17  the same injury as the class members."   In re Pet Food

18  Products Liability Litigation.   "No minimum number of

19  plaintiffs is required to maintain a suit as a class

20  action, but generally if the named plaintiff demon-

21  strates that the potential number of plaintiffs exceed

22  40, the first prong of Rule 23(a) has been met."

23  Stewart v. Abraham, 275 F.3d 220, at 226-27, 3d Cir.

24  2001.

25          Here the numerosity element is easily

1    satisfied.   There are potentially millions of class

2    members dispersed throughout the United States and,

3    therefore, joinder of all class members is impracti-

4    cable.

5            Commonalty.

6            Commonality requires that "there are questions

7    of law or fact common to the class."  Rule 23(a)(2).

8    The threshold for establishing commonality is

9    straightforward.   "The commonality requirement will be

10   satisfied if the named plaintiffs share at least one

11   question of fact or law with the grievances of the

12   protective class."  In re Schering Plough, 589 F.3d

13   585, at 596-97, 3d Cir. 2009, quoting Baby Neal v.

14   Casey, 43 F.3d 48, at 56, 3d Cir. 1994.   Indeed, as

15   the Third Circuit pointed out, "It is well established

16   that only one question of law or fact in common is

17   necessary to satisfy the commonality requirement

18   despite the use of the plural 'questions' in the

19   language of Rule 23(a)(2)."  In re Schering Plough,

20   589 F.3d at 97, note 10.   Thus, there is a low

21   threshold for satisfying this requirement.  Newton v.

22   Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d,

23   154, 183, 3d Cir. 2001, and In re Sch. Asbestos

24   Litigation, 789 F.2d, 996, 1010, 3d Cir. 1986,

25   highlighting that the threshold of commonality is not

1    high.

2        Indeed, the requirements of commonality and

3    typicality are broadly defined and tend to merge.

4    Baby Neal, 43 F.3d., at 56.  "Both criteria seek to

5    assure that the action can be practically and effi-

6    ciently maintained and that the interests of the

7    absentees will be fairly and adequately represented."

8    Baby Neal.  Despite their similarity, commonality,

9    like numerosity, evaluates the sufficiency of the

10    class itself, and typicality, like adequacy of

11    representation, evaluates the sufficiency of the named

12    plaintiff.  See Hassine v. Jeffes, 846 F.2d 169, at

13    177, note 4, 3d Cir. 1998; Weiss v. York Hospital, 745

14    F. 786, at 810, 3d Cir. 1984, cert. denied, 470 U.S.

15    1060, 1985.  More importantly, neither of these

16    requirements mandates that all putative class members

17    share identical claims, and that "factual differences

18    among the claims of the putative class members do not

19    defeat certification."  Baby Neal, 43 F.3d at 56.  In

20    that regard, class members can assert a single common

21    complaint even if they have not all suffered actual

22    injury; demonstrating that all class members are

23    subject to the same harm will suffice.  Hassine, 846

24    F. At 177-78, and cf. Riley v. Jeffes, 777 F. 143, at

25    147, 3d Cir. 1995.  Finding constitutional violation

1   in prisoners being subject to constant threat of

2   violence and sexual assault and rejecting contention

3   that plaintiff must actually be assaulted before

4   obtaining relief.  "Even where individual facts and

5   circumstances do become important to the resolution,

6   class treatment is not precluded."  <u>Baby Neal</u>, 43 F.3d

7   at 56.

8        In this case, in the consolidated complaint,

9   plaintiffs originally proposed to separate the class

10  into four subclasses:

11       1, a national marketing class of persons who

12  signed up for broadband telephone services with

13  Vonage;

14       2, a national cancelation class of persons who

15  were charged monthly service fees, disconnection fees,

16  or other fees after canceling Vonage's service;

17       3, a California marketing class of California

18  residents who signed up for broadband telephone

19  services with Vonage;

20       4, a California cancelation class of

21  California residents who were charged monthly service

22  fees, disconnection fees, or other fees after

23  canceling Vonage's service.

24       With respect to the California class members,

25  named plaintiffs Nevelson and Terrell asserted

1    separate state law claims against Vonage.  However,

2    for settlement purposes, the Court recognizes that the

3    California class members need not have their own

4    separate class because this settlement globally

5    resolves all class claims.  In that regard, the Court

6    finds that there are common questions of law or fact

7    shared amongst the class.  Importantly, common to all

8    members is the issue of whether Vonage engaged in a

9    deceptive and misleading advertising campaign,

10   specifically, whether Vonage misrepresented the scope

11   of its promotional programs and improperly collected

12   fees despite requests for cancelation.  Indeed, class

13   members who are current or former customers of Vonage

14   were subject to these allegedly deceiving practices.

15   As such, the elements of commonality are met.

16          Typicality.

17          "The concepts of commonality and typicality

18   are broadly defined and tend to merge because they

19   focus on similar aspects of the alleged claims."

20   Newton, 259 F.3d at 182.  Specifically, Rule 23(a)(3)

21   requires that "the claims of the representative

22   parties be typical of the claims of the class."

23   Typicality acts as a bar to class certification only

24   when "the legal theories of the named representatives

25   potentially conflict with those of the absentees."

1  <u>Georgine v. Amchem Products</u>, 83 F.3d 610 at 631, 3d

2  Cir. 1996, and <u>Newton</u>, 259 F.3d at 183.  "If the

3  claims of the named plaintiffs and putative class

4  members involve the same conduct by the defendant,

5  typicality is established regardless of factual

6  differences."  <u>Newton</u> at 184.

7       In other words, the typicality requirement is

8  satisfied as long as representatives and the class

9  claims arise from the same event or practice or course

10  of conduct and are based on the same legal theory.

11  <u>Brosious v. Children's Place Retail Stores</u>, 89 F.R.D.,

12  138 at 146,  District of New Jersey, 1999.  Here,

13  since plaintiffs' claims arise from the same course of

14  conduct and are predicated on the same legal theories

15  as the claims of all other members of the class, that

16  is, the alleged misleading misrepresentations and

17  false advertising in connection with Vonage's

18  marketing practices, the typicality requirement of

19  Rule 23(a) is satisfied.

20       Turning to adequacy of representation.

21       Class representatives must "fairly and

22  adequately protect the interests of the class."

23  23(a)(4).  This requires a determination of:  1,

24  whether the representatives' conflict with those of

25  the class, and, 2, whether the class attorney is

1    capable of representing the class.  <u>Newton</u>, 259 F.3d

2    at 187.  The Supreme Court has stressed that this

3    element "serves to uncover conflicts of interest

4    between named parties and the class they seek to

5    represent."  <u>Amchem</u>, 521 U.S., at 625.  It also

6    functions as a catch-all requirement that "tends to

7    merge with the commonality and typicality requirement

8    of 23(a)."  <u>Amchem</u> at 626, note 20.

9         Here the named plaintiffs are adequate repre-

10   sentatives for the class because each of them

11   encountered Vonage's alleged deceptive marketing

12   practices.  Plaintiffs Nahay and Starrett were

13   improperly charged fees by Vonage after each canceled

14   the service.  Plaintiffs Nevelson and Terrell were

15   improperly charged by Vonage for service that should

16   have been free under Vonage's one month free

17   promotion.  Plaintiff Pennock was denied the benefit

18   of Vonage's money-back guarantee and improperly

19   charged fees by Vonage after she canceled the service.

20   Plaintiffs Trama and Stewart were improperly charged

21   fees by Vonage after Vonage transferred his telephone

22   number.  In that respect, like all members of the

23   class, plaintiffs were subject to the same challenged

24   marketing policies and practices.

25        In addition, plaintiffs have no interests that

1    are antagonistic to or in conflict with the class

2    because their alleged injuries are identical to those

3    suffered by class members.  As such, the absent class

4    members' interests will be protected adequately.  See

5    In re Warfarin Sodium Antitrust Litigation, 391 F.3d

6    at 522, 3d Cir. 2004.  Moreover, having reviewed

7    co-lead counsel's resumes, the Court is satisfied that

8    the law firms of Cohen, Milstein, Sellers & Toll,

9    PLLC, and Seeger, Weiss, LLP, are experienced in class

10   action and consumer fraud litigation, and, therefore,

11   they are adequate to represent the interests of

12   plaintiffs and the class.

13         Turning to Rule 23(b)(3), superiority

14   requirements.

15         In addition to meeting the requirements of

16   Rule 23(a), the class must also satisfy Rule 23(b)(3).

17   Rule 23(b)(3) requires that "a class action be

18   superior to other available methods for the fair and

19   efficient adjudication of the controversy."  The rule

20   sets out several factors relevant to the superiority

21   inquiry:  The interest of members of the class in

22   individually controlling the prosecution or defense of

23   separate actions; the extent and nature of any liti-

24   gation concerning the controversy already commenced by

25   or against members of the class; the desirability or

1    undesirability of concentrating the litigation of the

2    claims in the particular forum; and the difficulties

3    likely to be encountered in the management of a class

4    action.  Essentially, the superiority requirement

5    "asks the Court to balance in terms of fairness and

6    efficiency the merits of a class action against those

7    of alternative available methods of adjudication."

8    Prudential, 148 F.3d at 316, In re Warfarin, 392 F.3d

9    at 532-33.

10          In this case, each of these factors weigh in

11   favor of class certification.

12          First:  The expense of individual actions in

13   this consumer fraud action, weighed against the

14   potential recovery, would clearly be cost prohibitive.

15          Second:  This is a multi-district litigation

16   whereby all of the suits filed against Vonage

17   nationwide relating to Vonage's marketing practices

18   have been consolidated and are now properly before the

19   Court.

20          Third:  Since there is no related litigation

21   pending in this district or elsewhere, there is no

22   indication that potential individual plaintiffs would

23   prefer to prosecute their claims individually, and

24   class members were given the opportunity to opt out of

25   the class.

1    Indeed, this district is the most appro-
2    priate venue since Vonage's principal place of
3    business is located in the district, most of the
4    decisions regarding the alleged misleading advertising
5    decisions were made in this district, and much of the
6    evidence and many of the witnesses relevant to
7    plaintiffs' claims are located here.
8    In addition, no unusual difficulties in
9    managing this litigation have been encountered.
10    Finally, when confronted with a request for
11    settlement-only class certification, the Court need
12    "not inquire whether the case if tried would present
13    intractable management problems, for the proposal is
14    that there be no trial." Amchem, 521 U.S. at 620.
15    In addition, to meet the requirements of
16    Rule 23(b)(3), named plaintiffs must show that common
17    questions of law or fact predominate over questions
18    affecting only individual class members.  In
19    determining whether common questions predominate,
20    Courts have focused on the claims of liability against
21    defendants.  See Bogosian v. Gulf Oil Corp., 561 F.
22    434 at 456, 3d Cir. 1977.  As stated earlier in this
23    opinion, common legal and factual questions are shared
24    amongst the class members and plaintiffs in this
25    action.  Specifically, class members and plaintiffs

1    challenge the same alleged marketing policies and

2    practices by Vonage.  Accordingly, the factual and

3    legal principles to be addressed by plaintiffs in

4    prosecuting these claims are sufficiently common to

5    the entire class thereby satisfying the predominance

6    requirement.

7         Having weighed all the factors and considered

8    all the requirements of class certification, the Court

9    finds that it is appropriate to certify the class for

10   settlement purposes.

11        Turning now to the settlement itself.

12        At the outset I note that the law encourages

13   and favors settlement of civil actions in federal

14   courts, particularly in complex class actions.  In re

15   Warfarin, 391 F.3d at 535; see In re General Motors,

16   55 F.3d 768 at 784, 3d Cir. 1995.  "The law favors

17   settlement particularly in class actions and other

18   complex cases where substantial judicial resources

19   can be conserved by avoiding litigation."

20   Accordingly, when a settlement is reached on terms

21   agreeable to all parties, it is to be encouraged.

22   Bell Atlantic Corp. v. Bolger, 2F.3d 1304 at 1314,

23   note 16, 3d Cir. 1993.

24        Nevertheless, a class action settlement may

25   not be approved under Rule 23(a) without a determina-

1   tion by the Court that the proposed settlement is

2   "fair, reasonable, and adequate."  See In re Cendant,

3   264 F.3d at 231; and also Rule 23(e)(1)(A).  The Third

4   Circuit has on several occasions stressed the impor-

5   tance of Rule 23(e) noting that "The District Court

6   acts as a fiduciary who must serve as a guardian of

7   the rights of absent class members."  General Motors,

8   55 F.3d at 785; and See also Amchem, 521 U.S. at 623,

9   noting that the Rule 23(e) inquiry "protects unnamed

10   class members from unjust or unfair settlements

11   affecting their rights when the representatives become

12   fainthearted before the action is adjudicated or are

13   able to secure satisfaction of their individual claims

14   by a compromise."

15        However, in cases such as this where settle-

16   ment negotiations precede class certification and

17   approval for settlement and certification are sought

18   simultaneously, the Third Circuit requires District

19   Courts to be even "more scrupulous than usual" when

20   examining the fairness of the proposal settlement.

21   See General Motors, 55 F.3d at 805.  This heightened

22   standard is intended to ensure that class counsel has

23   engaged in sustained advocacy throughout the course of

24   the proceeding, particularly in settlement negotia-

25   tions, and has protected the interests of all class

1    members.  See Prudential, 148 F.3d at 317.

2           To ensure fairness, the Third Circuit has

3    identified nine factors to consider when determining

4    whether a proposed class action settlement is fair,

5    reasonable, and adequate.  See Girsh v. Jepson, 521

6    F.2d 153 at 157, 3d Cir. 1975.  The factors are:

7           1, the complexity, expense, and likely

8    duration of the litigation;

9           2, the reaction of the class to the

10   settlement;

11          3, the stage of the proceedings and the amount

12   of discovery completed;

13          4, the risks of establishing liability;

14          5, the risks of establishing damages;

15          6, the risks of maintaining the class action

16   through the trial;

17          7, the ability of the defendants to withstand

18   a greater judgment;

19          8, the range of reasonableness of the settle-

20   ment fund in light of the best possible recovery; and

21          9, the range of reasonableness of the settle-

22   ment fund to a possible recovery in light of all the

23   attendant risks of litigation.

24          This Court has considerable discretion in

25   approving a proposed settlement of the class action.

1    In light of the above principles, the Court will

2    determine whether the settlement in this case is

3    reasonable.

4         The first factor involves a consideration of

5    the "probable costs" in both time and money of con-

6    tinued investigation.  In that regard, the complexity,

7    expense, and likely duration of litigation in a

8    securities class action weighs in favor of approving

9    elements.  This Court in this case, this marketing

10   case, finds that the first factor weighs in favor of

11   settlement.

12        Here, the case would involve complex and

13   protracted discovery, extensive trial preparation, and

14   various legal and factual issues.  Due to Vonage's

15   procedural challenge involving arbitration, the

16   parties have not engaged in any meaningful discovery.

17   Indeed, numerous depositions would have to be taken if

18   Vonage's procedural challenge does not succeed.  In

19   that regard, this litigation would likely be drawn out

20   with an extended discovery period necessary and a

21   trial that would likely not occur until the distant

22   future.  Moreover, given the breadth of the alleged

23   deceptive marketing conduct on the part of Vonage,

24   extensive expert discovery may be necessary.  Accord-

25   ingly, there remains a substantial amount of money and

1    time to be spent if this litigation were to continue.

2          More specifically, class counsel would have to

3    spend extensive time to review thousands of pages of

4    documents produced from Vonage and take numerous

5    depositions of both defendants and employees of

6    Vonage.  Moreover, completing a trial of this litiga-

7    tion would take several additional months and would

8    inevitably be followed by appeals, all of which would

9    delay any eventual payout to the class.

10         More importantly, during the pendency of this

11   matter, the Supreme Court issued its decision in AT&T

12   Mobility LLC v. Concepcion, 2011 WL 1561956, U.S.,

13   April 27th, 2011, wherein the Court held that state

14   contract law which would deem class-action waivers in

15   arbitration agreements unenforceable when certain

16   criteria are met is preempted by the Federal Arbitra-

17   tion Act because it stands as an obstacle to the

18   accomplishment and execution of the full purposes and

19   objectives of Congress.  This decision has a sub-

20   stantial impact on this litigation because there is a

21   similar arbitration clause like the one in Concepcion

22   included in Vonage's terms of service.  Indeed, Vonage

23   had moved to compel arbitration based upon that

24   clause.  Plaintiffs would face an uphill battle in

25   opposing Vonage's motion in light of the Supreme

1    Court's decision; and should Vonage prevail, class

2    members would be compelled to arbitrate their claims

3    on an individual basis.  As such, this factor greatly

4    favors settlement.

5            Turning to reaction of class members.

6            As indicated earlier, there are millions of

7    class members nationwide, and timely notices were sent

8    to over four million people.  To date, the Court has

9    received only 103 opt-outs and 12 objections.

10           MR. LAMANCUSA:  Five million, your Honor.

11           THE COURT:  Five million.

12           MR. LAMANCUSA:  That's correct.

13           THE COURT:  Right.

14           The Court will briefly address the objections.

15           The objections fall generally into two

16   categories:  Customers whose asserted losses exceed

17   the benefits provided under the settlement and people

18   who are hostile to class actions and those objectors

19   who are hostile to class actions and lawyers.

20           The Court notes at the outset that 12

21   objections is certainly a small number as compared to

22   the millions of potential class members.  Having

23   reviewed the objections, the Court did not find that

24   any of them are sufficient for the Court to

25   re-evaluate the fairness of the settlement or the fees

1    requested here.  In particular, one objector simply

2    stated that "tort lawyers provide very little, if any,

3    value to society and have definitely done damage."

4    Similarly, another objector complained generally that

5    lawyers are paid "too much and class members are not

6    being paid enough."

7         These general objections are not proper bases

8    to object to the fairness of this settlement or the

9    attorneys' fees, and, as such, they mount no

10   meaningful challenge to the settlement.

11        Some objectors complained that they would not

12   be made whole because of the caps placed on each of

13   the benefit groups in the settlement.  For example,

14   one objector states that her losses are $42.79 but the

15   benefit is capped at $40.  Another objector asserts

16   that Vonage owes him $566.22, although he provides no

17   support for that amount.  The Court does not find that

18   these objections weigh in favor of rejecting the

19   settlement terms.

20        Indeed, in assessing the adequacy of a settle-

21   ment, the Court acknowledges that it is necessary to

22   consider that a settlement is a compromise, "a yield-

23   ing of the highest hopes in exchange for certainty and

24   resolution."  Prudential, 962 F.Supp. at 534.  In that

25   regard, not every class member would be able to recoup

1    all of his or her losses.  Certainly, however, the

2    Court finds that this settlement provides a fair and

3    reasonable relief to the class.  Indeed, to the extent

4    that the settlement does not fully compensate an

5    extreme situation, an objector has the opportunity to

6    opt out of the settlement and pursue his or her claims

7    individually.

8         Finally, other objectors question why the

9    settlement does not address the impact that their

10   disputes have had on their credit ratings.  However,

11   these issues were not part of the claims brought by

12   plaintiffs and are not relevant to the class claims or

13   the purpose of this settlement.

14        The Court notes that there are two objectors

15   who raised questions regarding the adequacy and timing

16   of the notice and claims process.  The Court need not

17   address these objections in detail because I have

18   already found that the claims process initiated and

19   administered by plaintiffs complies with the Court's

20   preliminary approval.  Indeed, an overwhelming number

21   of notices were sent out on a timely basis.

22        In sum, for the purpose of this factor, the

23   few objections and opt-outs from the class members as

24   compared to the potential number of class numbers

25   create a presumption that the factor weighs in favor

1    of settlement.  In re Cendant, 264 F.3d at 235.  "The

2    vast disparity between the number of potential class

3    members who received notice of the settlement and the

4    number of objectors creates a strong presumption that

5    this factor weighs in favor of the settlement."

6    Indeed, under Girsch, such a small member of negative

7    responses favors approval of a class action settle-

8    ment.  See Stoetzner v. U.S. Steel Corp., 897 F.2d

9    115, at 119, 3d Cir. 1990.  Objections by 29 members

10   of a class comprised of 281 "strongly favors

11   settlement."  In re Prudential Insurance, 962 F.Supp.

12   450 at 537, D.N.J., 1997.  A small number of negative

13   responses to settlement favors approval.  Weiss v.

14   Mercedes-Benz of North America, 899 F.Supp.1297, at

15   1301, D.N.J., 1995.  100 objections out of 30,000

16   class members weighs in favor of settlement.

17          Certainly, our numbers are even more greatly

18   skewed; the few number of objections and opt-outs

19   compared to the millions in the class.

20          Next, turning to the stage of proceedings and

21   the amount of discovery completed.

22          This factor "captures the degree of case

23   development that class counsel have accomplished prior

24   to the settlement.  Through this lens, Courts can

25   determine whether class counsel had an adequate

appreciation of the merits of this case before nego-
tiating."  In re Cendant, 264 F.3d at 235.  Even
settlements reached at a very early stage and prior to
formal discovery are appropriate when there is no
evidence of collusion and the settlement represents
substantial concession by both parties.

This case has been in litigation for more than
five years, and counsel have gained more than suffi-
cient information to evaluate the merits of
plaintiffs' claims, the strength of the defenses
asserted by Vonage, and the value of plaintiffs'
claims for purposes of settlement.  Although no formal
discovery was conducted in the litigation, the settle-
ment is modeled on the AG settlement.  The parties
were able to appreciate the value of the claims in
this case.

Simply stated, class counsel has had more than
adequate opportunity at this stage of the proceedings
to appreciate the merits of their claims as well as
thoroughly understand the legal and factual issues
encompassed within these claims.  Thus, class counsel
is in possession of sufficient information to allow it
to evaluate the fairness of the settlement, and this
factor weighs in favor of approval.

Risks in establishing liability and damages.

1           The fourth and fifth factors "survey the

2      potential risks and rewards of proceeding to litiga-

3      tion in order to weigh the likelihood of success

4      against the benefit of an immediate settlement."

5      In re Warafin, 391 F.3d at 537.  In other words, these

6      factors attempt "to measure the expected value of

7      litigating the action rather than settling it at the

8      current time."  In re Cendant, 264 F.3d at 237-39.

9      Both factors clearly weigh in favor of approval of

10     settlement in this case.

11          Here plaintiffs face the unique and substan-

12     tial risk in pursuing liability and damages in this

13     case in light of the Supreme Court's Concepcion

14     decision.  As this Court has explained, plaintiff

15     would face a tremendous hurdle in opposing Vonage's

16     motion to compel arbitration.  Should Vonage prevail,

17     plaintiffs would be unable to pursue Vonage on these

18     claims on a class action, but, rather, each class

19     member would have to resort to arbitrate his or her

20     claims individually.

21          To avoid such a result, the Court finds that

22     the settlement provides the best relief for the class.

23     In addition, factoring into the Court's determination

24     is class counsel's representation, with which this

25     Court agrees, that the settlement is well within the

1   range of reasonableness in light of the best possible

2   recovery, possible setoffs, and attendant risks of

3   litigation.  Accordingly, given the real and extensive

4   risks involved in this case for plaintiffs, these two

5   factors weigh heavily in favor of approval of the

6   settlement.  See In re Suprema Specialties, 2008 WL

7   906254, at 5-6, approving settlement where plaintiffs

8   would have difficulty establishing liability and

9   damages.  In re Genta Securities Litigation, 2008 WL

10  2229843, D.N.J. May 28, 2008, indicating the same.

11         Turning now to the factor of the risks of

12  maintaining the class action through trial.

13         Because the Court finds that plaintiffs would

14  likely not be able to proceed in this forum in light

15  of the arbitration clause, plaintiffs would not be

16  able to maintain class action status if they were

17  compelled to proceed individually in arbitration.

18  Even if plaintiffs were able to successfully oppose

19  Vonage's motion to compel arbitration, this factor

20  does not weigh against the settlement.  As the Third

21  Circuit has explained, this factor tends to be neutral

22  because under "Federal Rule of Civil Procedure 23(a),

23  a District Court may decertify or modify a class at

24  any time during the litigation if it proves to be

25  unmanageable," and proceeding to trial would always

1   entail the risk, even if slight, of decertification.

2   In re Cendant, 264 F.3d at 239.  Accordingly, the

3   Court finds this factor weighs in favor of settlement.

4          Turning to the defendant's ability to

5   withstand a greater judgment.

6          This factor addresses whether defendants

7   "could withstand a judgment for an amount signifi-

8   cantly greater than the proposed settlement."  In re

9   Cendant, 264 F.3d at 240.  In this instance, Vonage's

10   ability to withstand a greater judgment is not clear

11   as it is a matter of public record that Vonage has an

12   enormous debt while it continues to attempt to earn

13   revenues in an ever increasingly competitive market.

14   In re Safety Components, 66 F.Supp.2d, at 86-88.

15   Defendants' financial condition weighs in favor of

16   settlement.  Therefore, it is possible that after

17   years of costly litigation, Vonage would not be able

18   to withstand a judgment of a comparable amount of

19   money as the settlement could achieve.  Accordingly,

20   this factor militates in favor of approving the

21   settlement.

22          Turning to the range of reasonableness of the

23   settlement.

24          The last two factors evaluate whether the

25   settlement represents a fair and good value for a weak

1   case or a poor value for a strong case.   In re

2   Warfarin, 391 F.3d at 558.   "In conducting this

3   evaluation, it is recognized that settlement repre-

4   sents a compromise in which the highest hopes for

5   recovery are yielded in exchange for certainty and

6   resolution, and Courts should guard against demanding

7   too large a settlement based on the Court's view of

8   the merits of the litigation."   In re Safety

9   Components, 166 F.Supp.2d at 92; In re AT&T Corp.

10  Securities Litigation, 455 F.3d 160 at 170, 3d Cir.

11  2006.   Finding settlement was an excellent result in

12  light of the risk of establishing liability and

13  damages despite the fact that settlement possibly

14  represented only 4 percent of the total damages

15  claimed.

16          Here the Court is satisfied that in light of

17  the fact that plaintiffs would have a real risk of

18  pursuing their claims in this forum, these two factors

19  also weigh in favor of approving settlement.   In this

20  regard, an immediate recovery of $4.75 million in cash

21  to the class is advantageous and fair to the class.

22  Under the settlement, class members are eligible to

23  receive up to $195 for each account they had with

24  Vonage.   To compensate class members for Vonage's

25  one-month free promotion, and to recognize the lost

1   time between ordering Vonage's service and actual

2   activation, class members are eligible for $10 which

3   reflects full compensation for most class members in

4   this category.

5         Those class members who canceled after

6   introductory periods but were charged disconnection

7   fees are eligible for up to $25 for service charges --

8   that is, a full month -- and $80 for any equipment

9   charges that were assessed.  This represents full

10  compensation for most class members in this category.

11        Those class members who canceled after

12  introductory periods but were charged disconnection

13  fees are eligible for up to $40, which also represents

14  nearly the full compensation for those class members.

15        Finally, class members who canceled service

16  but continued to pay service fees without using the

17  service are eligible for up to $50.  This, too,

18  represents the full compensation for most class

19  members.

20        Assuming all of the 38,653 claims -- I think I

21  have the right number.  Correct?

22        MR. LAMANCUSA:  As of April 8th.

23        THE COURT:  Right.

24        (Continuing) -- claims received as of April 8,

25  2001, are paid at the maximum allowable amounts, these

1    claims would be paid in full.

2         Accordingly, having reviewed the settlement

3    terms, the Court finds that the settlement provides a

4    fair and reasonable recovery for the members of the

5    class.

6         Having weighed all of the factors, the Court

7    finds that the settlement is fair, reasonable, and

8    adequate, and, as such, the Court grants final

9    approval of the settlement pursuant to Rule 23(e).

10        Turning now to the attorneys' fees and

11   expenses.

12        Lead counsel from the law firm of Seeger

13   Weiss, LLP, and Cohen, Milstein, Sellers & Toll, PLLC,

14   requests an award of attorneys' fees and reimbursement

15   of expenses incurred in this litigation.  Lead counsel

16   requests a fee award of $1,583,175, which represents

17   33 1/3 percent of the $4.75 million settlement fund,

18   plus reimbursement of expenses of $30,437.41.

19        Attorneys' fees are typically assessed through

20   the percentage-of-recovery method or through the

21   lodestar method.  In re AT&T Corp. Securities

22   Litigation, 455 F.3d 160 at 164, 3d Cir. 2006.  The

23   percentage-of-recovery method applies a certain

24   percentage to the settlement fund.  See Welch &

25   Forbes, Inc. V. Cendant Corp., 43 F.3d 722 at 732,

1    note 10, 3d Cir. 2001.  The lodestar method multi-

2    plies the number of hours class counsel worked on a

3    case by a reasonable hourly billing rate for such

4    services.  In re AT&T, 455 F.3d at 164.

5         In common fund cases such as this one, the

6    percentage-of-recovery method is generally favored

7    because "it allows Courts to award fees from the fund

8    'in a manner that rewards counsel for success and

9    penalizes it for failure.'"  In re Rite Aid Corp.

10   Securities Litigation, 396 F.3d 294 at 300, 3d Cir.

11   2005.  However, the Third Circuit has recommended that

12   District Courts use the lodestar method to cross-check

13   the reasonableness of a percentage-of-recovery fee

14   award.  See Rite Aid, 396 F.3d at 305.  The cross-

15   check is performed by dividing the proposed fee award

16   by the lodestar calculation resulting in a lodestar

17   multiplier.  "When the multiplier is too great, the

18   Court should reconsider its calculation under the

19   percentage-of-recovery method with an eye toward

20   reducing the award."  Rite Aid, 396 F.3d at 306.  The

21   lodestar cross-check, while useful, should not

22   displace a District Court's primary reliance on the

23   percentage-of-recovery method.  In re AT&T, 455 F.3d

24   at 164.

25         When analyzing a fee award in a common fund

case, the Court considers several factors, many of which are similar to the Girsh factors as enunciated previously.  See Rite Aid, 396 F.3d at 301, note 9. These include:

       1, the size of the fund created and the number of persons benefitted;

       2, the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

       3, the skill and efficiency of the attorneys involved;

       4, the complexity and duration of the litigation;

       5, the risk of nonpayment;

       6, the amount of time devoted to the case by plaintiffs' counsel; and

       7, the awards in similar cases.

       The list is not exhaustive.  In Prudential, the Third Circuit noted three other factors that may be relevant and important to consider:

       1, the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations. Prudential, 148 F.3d at 338;

1        2, the percentage fee that would have been

2    negotiated had the case been subject to a private

3    contingent fee agreement at the time counsel was

4    retained;

5        3, any innovative terms of settlement.

6        The fee award reasonableness factors "need not

7    be applied in a formulaic way" because each case is

8    different "and in certain cases one factor may

9    outweigh the rest." Rite Aid, 396 F.3d at 301.  The

10   Court may also give some of these factors less weight

11   in evaluating a fee award.  See In re Cendant, 264

12   F.3d at 283, and Prudential, 148 F.3d at 339.

13       Moreover, the analysis of the Gunter factors

14   overlaps with the Girsh factors used to assess the

15   appropriateness of the settlement.  In that regard,

16   the Court will refer to its earlier findings when

17   reviewing the application.

18       Before analyzing the factors, I will delineate

19   the total lodestar amounts for attorneys, paralegals,

20   and law clerk time calculated at current market rates,

21   and, by using those numbers, perform a lodestar

22   cross-check to confirm the reasonableness of the

23   request.

24       I note at the outset that the parties have

25   been litigating this matter for over five years, and

1   while formal discovery had not taken place, a

2   substantial amount of documents were exchanged and

3   reviewed by counsel.  In addition, multiple motions

4   were filed in the case.  In light of the efforts, lead

5   counsel and their staffs represent that they spent a

6   total of 3,166.05 hours.  Counsel's rates vary between

7   attorneys and between paralegals, depending on the

8   position, experience level, and locale of the

9   particular attorney.

10          Having reviewed the attorneys' declarations,

11   the Court is satisfied that the hourly rate charged

12   for the attorneys and their staff is based upon a

13   reasonable hourly billing rate for such services in

14   the given geographical area, the nature of the

15   services provided, and the experience of each lawyer.

16   Gunter v. Ridgewood Energy Corp, 223 F.3d 190 at 195,

17   3d Cir. 2000.  Having determined that the hourly rates

18   are reasonable and the amount of hours spent

19   prosecuting the case is reasonable, the total lodestar

20   amount is approximately $1.46 million.  This figure

21   results in a multiplier of 1.08.  In this circuit,

22   multiples ranging from 1 to 4 are frequently awarded

23   in common fund cases when the lodestar method is

24   applied.  In re AT&T, 455 F.3d at 172; Weiss, 899

25   F.Supp. at 1304; and a number of other cases.  As

1   such, this Court finds a multiplier of 1.08 is fair

2   and reasonable, and, against this backdrop, I will

3   analyze the factors.

4         The size of the fund and number of persons

5   benefitted.

6         As I have already noted, Vonage has diligently

7   sent out hundreds of thousands of notices to potential

8   class members and a substantial number of claims have

9   been filed by those members.  Indeed, under the

10   calculations provided by counsel, most class members

11   will receive full compensation as to the fees and

12   charges they incurred as a result of Vonage's alleged

13   deceptive marketing practices.

14         As I have set forth and determined previously,

15   I reiterate here that the settlement provides a fair

16   and reasonable recovery for the members of the class

17   since it will likely make many of the class members

18   whole.  In that regard, lead counsel were able to

19   obtain a sizeable result on behalf of the class

20   despite the substantial risks they faced in pursuing

21   their claims here in this forum and ultimately

22   establishing liability.  Moreover, many thousands of

23   people would likely participate in settlement given

24   that notice of the settlement was sent to millions of

25   class members.  Hence, this factor supports counsel's

1    fee application.

2         Regarding objections, as the Court indicated

3    earlier, there are currently only 12 objections made

4    by class members.  I've discussed those objections

5    before, and, indeed, they were either of the most

6    general nature as to a general aversion to class

7    actions or lawyers or as to a very specific objection

8    as to an individual.  In that regard, the absence of

9    any meaningful objections and the minimal number of

10   objections are probative in determining that the fee

11   request is fair.  Rite Aid, 396 F.3d at 305; In re

12   AT&T, 455 F.3d at 170.  Accordingly, this factor

13   weighs in favor of approving the fee request.

14        Turning to the skill of class counsel.

15        To measure the quality of counsel, Courts

16   examine the result achieved, the difficulties faced,

17   and the speed and efficiency of the recovery, the

18   experience and expertise of counsel, and the per-

19   formance and quality of opposing counsel.  Milliron v.

20   T-Mobile USA, Inc., 2009 WL 3345762 at 10, D.N.J.,

21   September 10, 2009.  In this case, lead counsel,

22   without the benefit of a formal discovery process,

23   conducted an investigation relating to the alleged

24   deceptive marketing practices by Vonage.

25        Despite the difficulties of pursuing the class

1    claims in this forum, lead counsel negotiated a size-

2    able settlement within a reasonable amount of time

3    since the start of this litigation.  Because of those

4    efforts, the class will benefit more.  Had the case

5    proceeded further, it would have resulted in more

6    expenditure of fees and costs, or an eventual

7    dismissal.

8         As I have determined earlier, class counsel

9    are skilled and experienced in litigating these types

10   of cases.  In fact, class counsel have prosecuted this

11   action against prominent national firms with ample

12   resources -- the Drinker, Biddle & Reath firm, the

13   Duane, Morris firm, and the Bingham, McCutchen firm.

14   The fact that lead counsel negotiated a favorable

15   settlement with these firms, the Court finds this

16   factor weighs in favor of approving the fee request.

17        Turning to complexity and duration of the

18   litigation.

19        The Court has already noted, when analyzing

20   the first Girsh factor, that the claims against

21   defendants were complex, and it was uncertain whether

22   plaintiffs would prevail in light of the Concepcion

23   case.  Without repeating the previous findings on this

24   issue, I find again that, by successfully negotiating

25   a settlement, lead counsel provided the class with a

1    substantial benefit at this juncture.  Thus, this

2    factor weighs in favor of approving the fee request.

3            Turning to risk of non-payment.

4            Under the seventh Girsh factor, I had already

5    indicated that it is possible Vonage would not be able

6    to withstand a greater judgment based on its financial

7    status.  In this regard, receiving little or no

8    recovery is a major factor in considering an award of

9    attorneys' fees.  Thus, this factor weighs in favor of

10   approving the fee request.

11           Turning to the time devoted to the litigation.

12           Lead counsel have devoted significant time to

13   the litigation.  Since the inception of this case,

14   counsel spent well over 3,000 hours of professional

15   time in prosecuting the case.  Having accepted the

16   responsibility of prosecuting the class action on a

17   contingent fee basis and without any guarantee of

18   success or award, lead counsel, nonetheless, was able

19   to negotiate a settlement that will benefit the class

20   members.  Considering that there were a number of

21   pretrial motions class counsel had to litigate and

22   principally whether it could proceed in this forum,

23   the Court concludes class counsel's efforts also weigh

24   in favor of approval.

25           Turning to awards in similar cases.

1        The comparison of the fee sought by lead

2   counsel with fees awarded in recent class actions

3   militates in favor of approving the fee.   Although

4   there is no general rule, the Third Circuit has

5   observed that fee awards in common fund cases range

6   from 19 percent to 45 percent of the settlement fund.

7   In re Lucent Technology, 327 F.Supp.2d at 432, which

8   listed more than twenty actions at that time where

9   Courts have approved fee awards between 22.5 percent

10   and 33 1/3 percent.   Accordingly, this factor weighs

11   in favor of approval.

12        Having analyzed all of the factors, the Court

13   finds that a fee request of 33 1/3 percent of the

14   total settlement fund is reasonable, and I will

15   approve the request.

16        Turning to class counsel expenses.

17        Expenses are compensable in a common fund case

18   if they are of the type typically billed by attorneys

19   to paying clients in the marketplace.   In re Safety

20   Component, 166 F.Supp.2d at 108.   Lead counsel's

21   expenses in this case total $30,437.41, which include

22   consulting and investigation fees, photocopying of

23   documents, online research, messenger service,

24   postage, long distance telephone calls, court costs,

25   and other incidental expenses related to the prose-

1    cution of the case.  These expenses are all of the

2    types that Courts in this district have approved, and,

3    accordingly, I approve the request for reimbursement

4    of these expenses.

5            Finally, I note pursuant to Article V,

6    Paragraph 3 of the settlement agreement, lead counsel

7    is to decide upon the distribution of attorneys' fees

8    among the eligible counsel.  All parties to the

9    settlement agreement agreed to its terms, and, as

10   such, lead counsel will make the appropriate distri-

11   butions to counsel from the award.

12           Finally, in recognition of their services to

13   the class, each named plaintiff is entitled to a

14   payment of $1,000 under the terms of the settlement.

15   Courts routinely approve awards to compensate named

16   plaintiffs for the service they provide and risk

17   incurred during the course of the class calculation.

18   See sChemi v. Champion Mortgage, 2009 WL 1470429, at

19   13, D.N.J., May 26, 2009.  Since the amount sought for

20   each plaintiff is relatively nominal, I also find that

21   request is appropriate, and I will approve that as

22   well.

23           I think that deals with all of the matters.  I

24   was provided with a proposed form of approval of order

25   and judgment in this matter, which I'll review at this

1   time and I'll be prepared to sign it.  So if you just

2   give me a couple of minutes to go back to fill in some

3   of the numbers, and if you want to wait, we can give

4   you copies of the signed approval of order and

5   judgment to take with you today.

6           Thank you.

7           THE CLERK:  All rise.

8           (Proceedings concluded.)

9   ///

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, **Vincent Russoniello**, Official United States Court Reporter and Certified Court Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I do further certify that I am neither a relative nor employee, nor attorney, nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel and that I am not financially interested in this action.

S/Vincent Russoniello
Vincent Russoniello, C.C.R.
Certificate No. 675
Date:   June 6, 2011